SANDSTONE INVESTMENTS I, LLC, Plaintiff–Appellant,

v.

A. EVERETT WILLIAMS 1963 TRUST and George C. Williams 1963 Trust, Defendants–Appellees.

No. 00CA1661.

Colorado Court of Appeals, Div. V.

Nov. 8, 2001.

Certiorari Denied Aug. 19, 2002.

Chrisman, Bynum & Johnson, P.C., Darrell M. Daley, Jack M. Graves, Boulder, CO, for Plaintiff–Appellant.

Trine & Metcalf, P.C., William A. Trine, Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, CO, for Defendants–Appellees.

Opinion by Judge CRISWELL.*

In this contract dispute, plaintiff, Sandstone Investments I, LLC, appeals the trial court's judgment denying specific performance of its contract to purchase realty from defendants, the A. Everett Williams 1963 Trust (Everett Trust) and the George C. Williams 1963 Trust (George Trust). Plaintiff specifically disputes the court's conclusion that another contract between the trusts and Petur S. Williams (Petur) was properly consummated. We reverse.

A single trustee acted as such for both the Everett Trust and the George Trust. Each trust held a fifty percent interest in two parcels, one of which is the subject of this litigation (the property).

In 1998, the trustee decided to sell each trust's interest in the property, and he engaged a real estate agent to act on behalf of both. Ultimately, Petur, one of the beneficiaries of the George Trust, entered into an agreement with the trustee to purchase each trust's interest in the property.

The trustee also entered into what has been referred to as a "backup" contract with plaintiff. This contract acknowledged the existence of Petur's agreement and that that agreement established a closing date of July 1, 1999. Plaintiff's contract provided, then, that if Petur's agreement was "not consummated," the real estate agent was to notify plaintiff of that fact, and plaintiff's contract would become effective. Plaintiff would then be required to pay $25,000 in certified funds "on or before July 6, 1999"; the closing under plaintiff's contract would occur "[o]n a date agreed to by all parties, but no later than July 23, 1999"; and plaintiff would be given possession of the property at the time of the closing.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24-51-1105, C.R.S.2001.

Petur's agreement did not close on July 1, 1999. Rather, on June 30, 1999, he requested a sixty-day extension of time to close. On July 1, the trustee offered to extend the closing date only to August 2, and on July 9, Petur accepted this counterproposal. Plaintiff was not consulted with respect to this extension.

Meanwhile, on July 6, before Petur's agreement was extended, the real estate agent delivered a letter to plaintiff stating that the "pending sale [to Petur] set for July 1, 1999 did not close," but that the trustee had offered to extend the closing date to August 2. On the same day, in compliance with the terms of its contract, plaintiff delivered $25,000 in certified funds to the trustee's agent.

Thereafter, the trusts determined that, for tax reasons, the property should not be sold. Therefore, they agreed to exchange property interests, so that the George Trust would become the owner of the property and the Everett Trust would become the owner of the other parcel. This exchange took place on August 2, 1999, and thereafter, the George Trust leased the property to an entity controlled by Petur.

After this exchange was accomplished, plaintiff was notified that the property was no longer available for sale, and its earnest money was returned. Thereupon, plaintiff filed this action asserting that Petur's agreement had not been consummated and seeking specific performance of its contract.

The trial court rejected plaintiff's claim, concluding that the exchange of property interests by the trusts constituted a "consummation" of Petur's original agreement. Plaintiff appeals from the resulting judgment.

## I.

Plaintiff contends that, because Petur's agreement was not "consummated" by July 1, 1999, the only condition precedent to the effectiveness of its contract occurred, and it was entitled to close on the sale to it no later than July 23, 1999, as its contract required. We agree.

We first observe that classifying plaintiff's contract as a "backup" contract, as counsel do, does little to forward the analysis of the parties' respective rights and obligations. The term "backup" here indicates only that, in accordance with its specific terms, its effectiveness was subject to an express condition precedent, i.e., the failure of Petur's agreement to be "consummated."

However, the obligations assumed by the parties under plaintiff's contract were no less solemn or binding than those contained in Petur's agreement. And, if that condition precedent occurred, the trustee's obligation to sell to plaintiff became absolute. *See City of Colorado Springs v. Mountain View Electric Ass'n,* 925 P.2d 1378, 1383 (Colo.App. 1995)("[A] lawful contract based on valuable consideration for the delivery of a thing in the future, upon the happening of an event which may occur, creates enforceable rights and obligations.").

Nevertheless, the trusts argue and the trial court found that the language in plaintiff's contract used to describe the condition, i.e., that Petur's agreement not be "consummated," is ambiguous. Given the undisputed circumstances of the parties when plaintiff's contract was executed, we disagree. Rather, we conclude that this language must, necessarily, refer to a closing under Petur's agreement by July 1, 1999.

The determination whether a provision in a contract is ambiguous is a question of law. *Fibreglas Fabricators, Inc. v. Kylberg,* 799 P.2d 371, 374 (Colo.1990). To ascertain whether a provision is ambiguous, it must be examined and construed in harmony with the plain meaning of the words employed and by reference to all parts and provisions of the contract and to the nature of the transaction forming its subject matter. *Fire Insurance Exchange v. Rael,* 895 P.2d 1139, 1143 (Colo.App.1995).

A contract is ambiguous only if it is reasonably susceptible to more than one meaning. *Cheyenne Mountain School District # 12 v. Thompson,* 861 P.2d 711, 715 (Colo.1993). The mere fact that the parties differ in their interpretation of an instrument does not itself create an ambiguity. *Fibreg-*

*las Fabricators, Inc. v. Kylberg, supra,* 799 P.2d at 374.

■ In deciding whether a contract is ambiguous, a court may consider extrinsic evidence bearing upon the meaning of the written terms. However, the court may not consider the parties' own extrinsic expressions of intent. *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769, 777 (Colo. 1985).

■ Here, plaintiff's contract was negotiated with full knowledge of Petur's agreement, which specifically called for a closing by July 1, 1999. Plaintiff's contract, then, provided that it would become effective if Petur's agreement was not "consummated" in which event plaintiff was required to deposit $25,000 in certified funds by *July 6, 1999,* and a closing under plaintiff's contract was to occur before *July 23, 1999.* Plaintiff's contract, therefore, clearly contemplated that there would be a closing under Petur's agreement by July 1, or if not, plaintiff would be required to make its deposit with the real estate agent by July 6. Given these circumstances, the term "consummated" as used in plaintiff's contract is not ambiguous; it could only have been intended to refer to a *closing* under Petur's agreement by *July 1,* and to no other event.

This conclusion is in no manner inconsistent with the opinion in *Fiorelli v. Transamerica Financial Services, Inc.,* No. 98CA29, 1998 Ohio App. LEXIS 5120 (Ohio Ct.App. Oct. 2, 1998)(unreported), relied upon by the trusts and the trial court. There, the so-called primary contract made the buyer's obligation subject to the condition precedent of the buyer obtaining suitable financing. The so-called backup contract made its effectiveness dependent upon the primary contract not being "executed and completed" by a specified date. The buyer under the primary contract obtained suitable financing by that date, but a closing did not occur until a few days later. Noting that the backup contract (unlike plaintiff's contract here) made no reference to any closing date, the court held that the quoted phrase referred to the occurrence of the express condition precedent in the primary contract, the

obtaining of financing, and not to a date for the closing of the transaction.

Here, in contrast, both contracts established "closing" dates, and given the specific provisions of each, the term "consummated" in plaintiff's contract could only have referred to a closing under Petur's agreement on or before July 1.

II.

The trusts argue, however, that the trustee and Petur, as parties to the primary agreement for sale of the property, had the right, with or without the consent of plaintiff, to extend the date for closing under that agreement. However, we conclude that, even if they retained the right to extend the closing date, such extension could not affect plaintiff's rights under the specific terms of its contract unless it consented to such an extension.

■ We recognize that, generally, the parties to an agreement may modify that agreement at any time after its execution and even in a manner expressly forbidden by that agreement. *James H. Moore & Associates Realty, Inc. v. Arrowhead at Vail,* 892 P.2d 367 (Colo.App.1994).

■ Nevertheless, here, by agreeing that plaintiff's contract would become effective if there were no closing under Petur's agreement by July 1, and by requiring that, if no such closing under Petur's agreement occurred, plaintiff was to make its deposit by July 6, the trustee became obligated to close under plaintiff's contract pursuant to its terms, unless plaintiff consented to an extension of its contract. Such an extension was never requested or agreed upon.

Here, in entering into Petur's agreement, the trustee established a specific date for the closing, and he failed to expressly reserve the right to extend that date. Later, when he entered into plaintiff's contract, he also agreed, if Petur's agreement were not consummated, to close with plaintiff no later than a specific date. Again, no express right to extend that date was reserved.

We note that plaintiff's contract need not have specified a particular date for plaintiff's

deposit of funds or for closing. It could simply have provided that such actions were to occur within a specific number of days after notification of the failure of consummation of Petur's agreement. However, having agreed upon specific dates for the performance both by Petur and by plaintiff, the trustee could not thereafter change the date for the parties' performance under plaintiff's contract without plaintiff's consent. By agreeing to extend the date for Petur's performance to August 1, therefore, the trustee rendered it impossible to perform the contract obligation he owed to plaintiff without violating Petur's amended agreement. And, the trustee could not honor his agreement to extend Petur's closing date without violating the specific terms of plaintiff's contract.

We conclude, therefore, that the specific terms of plaintiff's contract restricted the trustee's right to amend Petur's agreement, if by doing so, he would be prevented from performing his obligation under plaintiff's contract. Hence, because Petur's agreement was not consummated in accordance with its original terms, plaintiff was entitled to have the trustee convey the property to it in accordance with the terms of plaintiff's contract.

### III.

The trial court appears also to have concluded that plaintiff waived its right to object to the extension of Petur's closing date. If the court did, in fact, reach this conclusion, it is not supported by the record. *See Vessels Oil & Gas Co. v. Coastal Refining & Marketing, Inc.*, 764 P.2d 391 (Colo. App.1988) (if facts are undisputed, appellate court may review issue of waiver on a de novo basis).

The only evidence of any waiver consists of a statement by plaintiff to its attorney made in writing on July 26. In this writing, plaintiff expressed as its practical "bottom line" that, while it might not object to a tax-free exchange of properties, rather than a sale to Petur, "if the property is not conveyed only to [Petur] on 8/3, we get it." There is no evidence that either the trustee or Petur

were made aware of that statement at the time, and indeed, it appears to have been made in confidence.

However, even if a confidential statement to counsel could appropriately be relied upon as evidence of a waiver, plaintiff's alleged waiver here was conditioned upon the property being conveyed only to Petur. That condition never occurred, and any alleged waiver, therefore, never became effective.

### IV.

Plaintiff also argues that Petur's agreement was not "consummated" because its later amendment resulted in a novation and the creation of an entirely new contract. However, because of the conclusions we have reached above, we need not address this issue.

The judgment is reversed, and the case is remanded with directions to enter a decree of specific performance consistent with the view expressed in this opinion.

Judge KAPELKE and Judge NIETO concur.